UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MOHAMMAD HASAN,

                                HONORABLE STEPHEN J. MURPHY, III

                 Petitioner,

v.                                   CASE NO. 08-12332

NICK LUDWICK,

                 Respondent.

_____/

## OPINION AND ORDER DENYING THE
## HABEAS CORPUS PETITION (docket no. 1) AND
## DENYING A CERTIFICATE OF APPEALABILITY, BUT
## GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner Mohammad Hasan has filed a pro se petition for the writ of habeas corpus challenging his Oakland County convictions for kidnapping, criminal sexual conduct, and assault with intent to do great bodily harm less than murder.  Hasan claims that: (1) his right to confront witnesses was violated by the admission of a co-defendant's statements to the police; (2) trial counsel deprived him of a fair and impartial jury; (3) trial counsel should have called certain witnesses in his defense, and objected to evidence that he did not profess to be innocent after requesting a plea bargain; and (4) his sentence violates the right to due process, his right to a jury trial, and his right not to be subjected to cruel and unusual punishment.  Warden Nick Ludwick argues in an answer to the petition filed through counsel that: (1) Hasan's first claim is procedurally defaulted and lacks merit; (2) the second and third claims lack merit; and (3) the sentencing claim is not cognizable on habeas review and lacks merit.  The Court agrees with the warden that Hasan is not entitled to habeas corpus relief.  Accordingly, the habeas petition will be denied.

# I. BACKGROUND

Petitioner was charged in Oakland County, Michigan with kidnapping, assault with intent to commit murder, assault with intent to do great bodily harm less than murder, and eight counts of criminal sexual conduct in the first-degree. The charges arose from incidents that occurred in Waterford Township and River Rouge, on January 20, 2002. That night, the two victims, Jeremiah Kelly and his female companion CK,[1] went to a dance club called Clutch Cargo's in Pontiac, Michigan. They became intoxicated and requested a taxi cab. When the cab driver refused to take them home, Hasan offered to give them a ride. The two victims the voluntarily got into a car with Hasan, Ali Tleis, and Erik Muehlenbein.[2] At some point, Mr. Kelly got sick and was hanging partially outside the car. Hasan jerked the car, causing Kelly to fall out. Hasan then ran over Kelly's leg, got out of the car, and joined Muehlenbein in kicking Kelly's head. They left Kelly lying outside on Myrtle Street in Waterford Township.

Hasan and his friends then took CK to Hasan's residence in River Rouge. She made repeated pleas to be taken back home, and Hasan subdued her by punching her in the face hard enough to split her lip. She was then taken to a bedroom in the house, where the three men took turns performing forced oral and vaginal sexual acts on her for a period of approximately four hours. When they were not engaged in these acts, the other two men would threaten and taunt the victim. CK was bleeding, crying, and periodically screaming

---

[1] Consistent with the state court's opinion, this Court will refer to the female victim by her initials.

[2] The record contains various spellings for the co-defendants' names. The Court has adopted the spelling used by the Michigan Court of Appeals.

at the men to stop throughout this ordeal, and the jury apparently found that none of these acts were consensual.

Subsequently, Hasan and his confederates took CK to Belle Isle Park in Detroit, where Hasan ordered her out of the car. After returning her phone, he punched her in the jaw as she attempted to dial a number, and struck her head against a tree. She fell down and played dead. After Hasan and the other men drove away, CK used her cell phone to call the police, who found her and took her to the police precinct for questioning.

On February 1, 2002, an employee working at Clutch Cargo's recognized Ali Tleis as one of the three men who had left the club with the victims on January 20, 2002. The employee notified the police, who questioned Tleis and released him. On February 5, 2002, the police interrogated Tleis and arrested him. During the interview, Tleis mentioned Hasan and another man named Hasan Awada, whom the police later learned was Erik Muehlenbein. Muehlenbein was arrested and, on February 6, 2002, CK identified him at a line-up. On the same day, CK identified Hasan in a photo array assembled by the police. On January 30, 2002, Hasan left the country for Pakistan. He was extradited to the United States in 2004, and on September 6, 2004, Sergeant Steve Ryner of the Waterford Township Police Department took custody of him.

Hasan's jury trial commenced in Oakland County Circuit Court on January 31, 2005. On February 4, 2005, the jury found Hasan guilty of kidnapping, two counts of assault with intent to do great bodily harm less than murder, and six counts of first-degree criminal sexual conduct.[3] The trial court sentenced Hasan as a second sexual offender and as a

---

[3] On the count of assault with intent to commit murder, the jury found Hasan guilty of the lesser-included offense of assault with intent do great bodily harm less than

habitual offender, second offense, to concurrent prison terms of forty to ninety years for the kidnapping and criminal sexual conduct convictions and eighty-three to 180 months (six years, eleven months to fifteen years) for the assault convictions. The Michigan Court of Appeals affirmed Hasan's convictions and sentence, *see People v. Hasan*, No. 261843 (Mich. Ct. App. Dec. 7, 2006), and on May 30, 2007, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Hasan*, 478 Mich. 870 (2007) (table).

Hasan filed his habeas corpus petition on May 30, 2008. His claims are:

I.    The admission of co-defendant Tleis's hearsay statements to the police officer violated Hasan's right to confrontation per *Crawford v. Washington.*

II.   Trial counsel was constitutionally ineffective and deprived Hasan of a fair and impartial jury by:

      A.   not moving for a change of venue or adequately questioning the jurors about pretrial publicity; and

      B. encouraging the prospective jurors to openly discuss their prejudices against individuals of Middle Eastern origin.

III.  Trial counsel was constitutionally ineffective and deprived Hasan of a fair trial by failing to:

      A.   call co-defendant Muehlenbein as a witness for the defense;

      B.  call Hasan's father as a witness to rebut evidence of flight;

      C.  move to suppress evidence of Hasan's post-arrest silence.

IV.   Hasan's sentence violated his right to due process, his right to a jury trial, and the prohibition against cruel and unusual

murder. The jury also acquitted Hasan of two counts of first-degree criminal sexual conduct.

4

punishment.

## II. STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), habeas petitioners are entitled to the writ of habeas corpus only if they can show that the state court's adjudication of their claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.

## III.  DISCUSSION

A.  <u>Ali Tleis's statements to the police</u>

The first habeas claim is based on Sergeant Steve Ryner's trial testimony about his and Sergeant Paul Osika's interrogation of Ali Tleis on February 5, 2002.  Sergeant Ryner explained that, during the interrogation, Tleis mentioned the names Moe Hasan and Hasan Awada.  Ryner then researched various law enforcement databases and determined that Hasan Awada was also known as Erik Muehlenbein and that he lived on South Morrow Circle in Dearborn, Michigan.  Sergeant Ryner testified that he confirmed the South Morrow Circle address with Ali Tleis during the interrogation and that Tleis recognized the address.  Tleis also informed Sergeant Ryner that the alleged sexual criminal conduct occurred at 58 Hill Street in River Rouge.  Tr.  Feb. 1, 2005, at 173–79.

Hasan alleges that testimony about Ali Tleis's statements to Sergeant Ryner violated his constitutional rights to a fair trial and to confront the witnesses against him because Tleis was unavailable for cross-examination.  Hasan also contends that the evidence was improper under *Bruton v. United States*, 391 U.S. 123 (1968), and *Cruz v. New York*, 481 U.S. 186 (1987).  The Michigan Court of Appeals adjudicated this claim on the merits and rejected it.  The Court of Appeals concluded that Sergeant Ryner's testimony regarding Tleis's statements was not inadmissible under the Michigan Rules of Evidence and that the testimony did not violate Hasan's right of confrontation because it was not offered to prove the truth of the matters asserted in the statements.

1.  <u>*Bruton v. United States*</u>

6

"The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Idaho v. Wright*, 497 U.S. 805, 813 (1990).  The Supreme Court held in *Bruton*, "that a defendant is deprived of his rights under the Confrontation Clause when his codefendant's incriminating confession is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Cruz*, 481 U.S. at 187-88.  In *Cruz*, the Supreme Court held that the Confrontation Clause bars the admission of  a nontestifying co-defendant's confession incriminating the defendant at their joint trial even if the jury is instructed not to consider it against the defendant and even if the defendant's own confession is admitted against him.  *Id.* at 193.  *Bruton* and *Cruz* are not applicable here because Hasan was not tried jointly with Ali Tleis and there was no confession admitted in evidence against Hasan.  Thus, he has no right to relief on the basis of *Bruton* or *Cruz*.

2. *Crawford v. Washington*

Hasan also relies on *Crawford v. Washington*, 541 U.S. 36, 68 (2004), in which the Supreme Court held that, "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination."  The Court determined that the term "testimonial" applied to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  *Id.; see also Davis v. Washington*, 547 U.S. 813, 822 (2006) (holding that statements made to the police during an interrogation are "testimonial" and subject to the Confrontation Clause "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or

prove past events potentially relevant to later criminal prosecution"). Significantly, however, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

The disputed statements in this case were not admitted for the truth of the matter asserted, but to provide a context for Sergeant Ryner's investigation and to show how he acquired information about Hasan's address, as well as Erik Muehlenbein's address and Arab name. Even if the statements were admitted for the truth of the matter asserted, Confrontation Clause errors are subject to harmless-error analysis, *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), and the alleged error here was harmless.

Detective Sergeant Paul Osika testified that he obtained a search warrant for 58 Hill Street in River Rouge, because he believed that was the scene of the crime. Tr. Feb. 1, 2005, at 297. Investigator Brian Asbridge testified that he found proof of residency for Hasan at that address. *Id.* at 198. Hasan himself did not dispute the location where the sexual incidents occurred or the fact that it was his residence. Nor did he dispute who was involved. The disputed issues were whether the sexual encounters were consensual, whether CK was forcibly taken to Hasan's residence, and whether Hasan intended to murder CK and commit great bodily harm against Mr. Kelly. Therefore, Sergeant Ryner's testimony concerning Ali Tleis's statements to him could not have had a "substantial and injurious effect or influence in determining the jury's verdict," and was therefore harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

B.  Trial Counsel and the Right to an Impartial Jury

8

The second habeas claim alleges that Hasan's trial attorney was ineffective for failing to ensure that Hasan had an impartial jury. This claim has two components. First, Hasan contends that his attorney should have moved for a change of venue or ascertained whether the prospective jurors had been influenced by extensive negative pretrial publicity. Second, Hasan asserts that his attorney incorrectly identified him as being from the Middle East.

The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), "qualifies as 'clearly established Federal law'" for purposes of evaluating ineffective-assistance-of-counsel claims. *Williams*, 529 U.S. at 391. Pursuant to *Strickland*, a habeas petitioner must demonstrate that his attorney's performance was deficient and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. A deficient performance requires proof "that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might by considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The prejudice prong of *Strickland's* test for ineffective assistance of counsel requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

1. <u>Failure to Move for a Change of Venue</u>

Hasan claims that extensive pretrial publicity portrayed him as a violent gang-rapist, who was a fugitive from justice. He maintains that his attorney should have moved for a change of venue or asked the prospective jurors whether they were influenced by the publicity. The Michigan Court of Appeals found no merit in this claim because Hasan failed to show that any juror was exposed to, and adversely influenced by, pretrial publicity. The Court of Appeals concluded that a motion for change of venue would have been futile.

"The Sixth and Fourteenth Amendments guarantee a criminal defendant an impartial jury in state court." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008) (citing *Ristaino v. Ross,* 424 U.S. 589, 595 n. 6 (1976), and *Irvin v. Dowd,* 366 U.S. 717, 722 (1961)), *cert. denied*, 129 S. Ct. 1986 (2009). Nevertheless, "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." *Dobbert v. Florida*, 432 U.S. 282, 303 (1977). The Court may not presume unfairness of constitutional magnitude "in the absence of a 'trial atmosphere . . . utterly corrupted by press coverage.'" *Id.* (quoting *Murphy v. Florida*, 421 U.S. 794, 798 (1975)).

> Prejudice resulting from pretrial publicity can be presumptive or actual. *Nevers v. Killinger*, 169 F.3d 352, 362 (6th Cir. 1999), abrogated on other grounds, *Harris v. Stovall*, 212 F.3d 940, 942-43 (6th Cir. 2000). Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community. *Ritchie* [*v. Rogers*, 313 F.3d 948, 952-53 (6th Cir. 2002)]; *Gall v. Parker*, 231 F.3d 265, 309 (6th Cir. 2000). Prejudice from pretrial publicity is rarely presumed. *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998).
>
> Where pretrial publicity cannot be presumed prejudicial, the trial court must then determine whether it rises to the level of actual prejudice. *Ritchie*, 313 F.3d at 962. The primary tool for discerning actual prejudice is a searching voir dire of prospective jurors. *Id.* The court must review the media

coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant. *Nevers*, 169 F.3d at 366. Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of impartiality. *Id.* at 366-67.

*Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 2507 (2008).

Hasan's trial occurred three years after the crimes were committed, and he has not shown that an inflammatory, circus-like atmosphere pervaded the courthouse and the surrounding community at the time of trial. Thus, even assuming that there was extensive negative pretrial publicity, prejudice cannot be presumed. As for actual prejudice, the record indicates that defense counsel asked the prospective jurors during voir dire whether anybody had heard anything about this case before they walked into the courtroom. Counsel also asked the prospective jurors whether anybody had read anything about the case on television or in the media. No one responded in the affirmative. Tr. Jan. 31, 2005, at 46.[4] Hasan has not shown that a single juror was aware of pretrial publicity or influenced by it, and the trial court stated in its preliminary instructions to the jurors that it was vital for the jurors not to pay any attention to media coverage of the trial. *Id.* at 112–13. Thus, defense counsel was not ineffective for failing to move for a change of venue or for failing to question the prospective jurors more thoroughly. *See Wickline v. Mitchell*, 319 F.3d 813, 822 (6th Cir. 2003) (denying habeas relief because the petitioner failed to present any evidence that the three-judge panel which decided his case was prejudiced by pretrial publicity).

---

[4]     All references to "Tr." in this Order refer to the transcripts from Hasan's trial and sentencing.

2. <u>Identifying Hasan as Middle Eastern</u>

Hasan claims that he is from Pakistan, which is populated primarily by Indo-Asians, not Arabs.  He faults his trial attorney for telling prospective jurors that he was from the Middle East, as opposed to Pakistan, and for eliciting negative comments from prospective jurors about Arabs.  He asserts that prejudice against people from the Middle East was projected onto him.  The Michigan Court of Appeals determined on review of this claim that Hasan himself made ethnicity an issue by claiming that the victims' offensive comments about Arabs provoked him to assault them.  The Court of Appeals also stated that Hasan had not overcome the presumption that defense counsel made a sound strategic decision to question the jurors on the subject.

a. <u>Clearly Established Federal Law</u>

"[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation . . . .  Due process means a jury capable and willing to decide the case solely on the evidence before it . . . ."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  Although "[t]he presence of even a single biased juror deprives a defendant of his right to an impartial jury," *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004) (citing *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)), jurors are presumed to be impartial, *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006) (citing *Irvin*, 366 U.S. at 723), and "'[a]ny claim that the jury was not impartial . . . must focus . . . on the jurors who ultimately sat' on the jury, not on those dismissed through peremptory challenges." *Beuke v. Houk*, 537 F.3d 618, 638 (6th Cir. 2008) (quoting *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988)), *cert. denied*, 129 S. Ct. 2792 (2009).

b. <u>Application</u>

During voir dire, defense counsel made the following comments about Hasan:

> It's obvious that this man is from the middle east, isn't it? And his name is Mohammad Hasan. And we all know that right now there's a lot of issues in this country with the middle east. Is that a fair statement?
>
> . . . .
>
> Okay. Would anybody hold it against him if you search your hearts really, because he's of middle eastern descent, do you think the rules shouldn't apply to him because he's a middle eastern person? The rules I mean, presumption of innocence, proof beyond a reasonable doubt, the right to remain silent, should receive a fair trial, shouldn't he?

Tr. Jan. 31, 2005, at 47–48.

One person responded, "Absolutely," and was excused for cause. *Id.* at 48. Although a number of other prospective jurors claimed that they had friends, acquaintances, co-workers, or family members who were from the Middle East, one person expressed ambivalence about whether he could be fair and impartial. He stated that he had friends from the Middle East and that he believed a person was innocent until proven guilty, but that every Middle Eastern person for whom he had worked in recent years owed him money. Defense counsel used a peremptory challenge to excuse that juror. *Id.* at 65–69.

Another prospective juror stated that, about five years earlier, she was a juror in a civil case where a Middle Eastern man sued someone for what she thought were unfounded injuries incurred during a car accident. Although she denied having any preconceived notions about people from the Middle East, defense counsel used a peremptory challenge to excuse her. *Id.* at 72-76, 79.

Still another prospective juror stated that he was deployed to the Middle East five times during his service with the United States Navy. He claimed that he had lost some

close friends over the years and had seen many shipmates killed. He thought that his experiences might hinder him, but he also stated that he could follow the law, that he did not think Hasan should receive less protection than other people, and that he would not let his loss of friends affect his handling of Hasan's case. Defense counsel excused him. *Id.* at 90-94, 97.

It is obvious from the record that defense counsel was attempting to identify and eliminate biased jurors. His performance was not deficient, and the alleged deficiency did not prejudice the defense, because all the prospective jurors who expressed negative feelings about people from the Middle East were excused. Petitioner, moreover, explained during his subsequent testimony that he was a Pakistani and that Pakistan is considered the Far East. Tr. Feb. 3, 2005, at 55. As the state court recognized, he made ethnicity an issue by claiming that he assaulted Mr. Kelly and struck CK because they made racist remarks about Arabs. *Id.* at 55-59, 75-78, 91. The trial court charged the jurors not to let sympathy or prejudice influence their decision. *Id.* at 171. For all these reasons, the Court concludes that defense counsel's comments and questions about Hasan's heritage did not amount to deficient performance and did not prejudice the defense.

C.  Trial Counsel and the Right to a Fair Trial

The third habeas claim alleges that Hasan's trial attorney should have called certain witnesses in Hasan's defense and objected to evidence of Hasan's silence following his extradition.

1.  Failure to Produce Muehlenbein

Hasan's defense to the charges of criminal sexual conduct charges was that CK consented to the sexual activity. Hasan contends that his attorney should have called Erik

14

Muehlenbein as a witness to support the defense of consent. According to Hasan, Muehlenbein would have testified that, on the night in question, CK was kissing Hasan, did not seem upset, and had consensual sexual relations with him, Hasan and Ali Tleis. The Michigan Court of Appeals stated on review of this claim that Hasan had not overcome the presumption that defense counsel made a sound strategic decision not to call Muehlenbein to testify. "The decision to call or not call certain witnesses is exactly the type of strategic decision that the courts expect attorneys to make." *Boykin v. Webb*, 541 F.3d 638, 649 (6th Cir. 2008) (collecting cases). The duty to investigate, however, "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).

Hasan alleges that Muehlenbein would have corroborated his defense of consensual sex, but by the time Hasan was tried, a jury had already found Muehlenbein guilty of criminal sexual conduct for the same incident. This information surely would have been elicited had Muehlenbein testified at Hasan's trial. The jury might have concluded that Muehlenbein's testimony was not credible and that a jury might draw the inference that if Muehlenbein was already found guilty of the crime, Hasan must also be found guilty. Thus, Muehlenbein's testimony could have harmed Hasan's case more than helped him. It was reasonable trial strategy not to call Muehlenbein as a witness.

2. Evidence of Flight and Failure to Produce Hasan's Father

The prosecutor elicited testimony that Hasan traveled to Pakistan on a one-way ticket several days after the crimes were committed. Hasan argues that this evidence was prejudicial and irrelevant, and that his attorney should have produced his father, Nadar Hasan, as a witness to testify that Hasan did not leave the country to evade prosecution.

The Michigan Court of Appeals stated on review of this claim that Hasan had not overcome the presumption that defense counsel made a sound strategic decision not to produce his father.

Although the Supreme Court and the Court of Appeals for the Sixth Circuit have expressed skepticism about the probative value of flight evidence, *Parker v. Renico*, 506 F.3d 444, 450-51 (6th Cir. 2007), the evidence can be relevant, *United States v. Scheffer*, 523 U.S. 303, 331 (1998), and admissible to show guilt. *Allen v. United States*, 164 U.S. 492, 499 (1896); *United States v. Dillon*, 870 F.2d 1125, 1126 (6th Cir. 1989). Nadar Hasan may have been helpful in rebutting evidence of flight by showing that his son left the country for innocent reasons. Petitioner Hasan, however, explained the reason for his trip to Pakistan when he testified. He stated that, long ago, his parents had arranged for him to get married and that he had intended to start a business in Pakistan. Tr. Feb. 3, 2005, at 81-82, 102-04.

Hasan was not deprived of a substantial defense by counsel's failure to produce Nadar Hasan, because petitioner Hasan admitted to the jury that he lied at his extradition hearing and lied to his father about why the authorities were looking for him. (*Id.* at 87-88, 100.) The jury likely would have viewed Nadar Hasan as biased or naive about his son's activities. Nadar Hasan, moreover, would have had no independent knowledge about the incidents in question or about his son's intent at the time of the crimes, and intent was the critical issue in the case.

Furthermore, the trial court instructed the jurors that Hasan's departure for Pakistan after the crimes did not prove guilt and that a person may run or hide for innocent reasons such as panic, mistake, or fear. The court went on to say that, although a person may also

run or hide due to consciousness of guilt, the jurors must decide whether the evidence was true and, if true, whether it showed that Hasan had a guilty state of mind. (Tr. Feb. 3, 2005, at 180.) For all these reasons, defense counsel's failure to produce Nadar Hasan did not amount to deficient performance and did not prejudice the defense.

      3. <u>Evidence of Post-Arrest Silence</u>

      Following extradition proceedings, Detective Sergeant Paul Osika escorted Hasan from Detroit Metropolitan Airport to the police department for booking and later to Hasan's arraignment. At trial, the prosecutor elicited evidence that Hasan informed Sergeant Osika before his arraignment that he wanted a plea bargain. Sergeant Osika testified that he told Hassan it was not the time to begin that process. On cross-examination, defense counsel asked Sergeant Osika whether Hasan explained what he wanted to plea bargain over – fighting Kelly, or hitting CK. Sergeant Osika responded that Hasan had not specified what he wanted to plea bargain. On re-direct examination, the prosecutor asked Sergeant Osika whether Hasan had said, "I am innocent of any crimes I am being charged for." Osika responded, "No." Tr. Feb. 1, 2005, at 299-304.

      Hasan claims that the prosecutor's question on re-direct examination was an attempt to use his silence against him and that his attorney's failure to suppress or object to the question and answer amounted to ineffective assistance. The Michigan Court of Appeals determined that the trial court did not err in allowing the prosecutor's question because there was no indication in the record that Hasan was being interrogated or had asserted his Fifth Amendment right to remain silent. The Court of Appeals concluded that defense counsel was not ineffective for failing to object to the evidence.

      a. <u>Clearly Established Federal Law</u>

The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "To give force to the Constitution's protection against compelled self-incrimination, the [Supreme] Court established in *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)] 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" *Florida v. Powell*, 130 S. Ct. 1195, 1203 (2010) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989)). "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. In *Doyle v. Ohio,* 426 U.S. 610 (1976), the Supreme Court held that the prosecution may not impeach a defendant with his or her silence following *Miranda* warnings because "every post-arrest silence is insolubly ambiguous," and the *Miranda* warnings carry an implicit "assurance that silence will carry no penalty." *Id.* at 617-18.

b. Application

Hasan concedes that there is no direct evidence that he had been advised of his constitutional rights before his arraignment. Furthermore, the Supreme Court has not addressed the constitutionality of using a defendant's pre-*Miranda* silence as substantive evidence of guilt. *Hall v. Vasbinder,* 563 F.3d 222, 232 (6th Cir. 2009). Although the Sixth Circuit Court of Appeals held in *Combs v. Coyle*, 205 F.3d 269, 282-83 (6th Cir. 2000), that pre-*Miranda* silence cannot be used as substantive evidence of guilt, *Combs* was decided under a pre-AEDPA, *de novo* standard of review and, therefore, is not controlling here. *Hall*, 563 F.3d at 232. The Court therefore concludes that defense counsel was not ineffective

18

for failing to object to the disputed question and answer.

Even if a Fifth Amendment error occurred, the reference to Hasan's silence was fleeting. The prosecutor did not mention it again or attempt to impeach Hasan with the evidence. Nor did the prosecutor mention Hasan's silence in his closing argument. Consequently, defense counsel's allegedly deficient performance did not prejudice the defense.

D. The Sentence

The fourth and final habeas claim challenges Hasan's sentence for kidnapping and six counts of criminal sexual conduct. Hasan argues that this sentence violates his right to due process, his right to have a jury determine the facts underlying his sentence, and his right not to be subject to cruel and unusual punishment. The Michigan Court of Appeals rejected each of these arguments.

1. Due Process

Hasan first claims that the trial court erred when scoring certain offense variables (OV) of the Michigan sentencing guidelines. "A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only," *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003), and "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990). Thus, Hasan's challenge to the scoring of the Michigan sentencing guidelines is not a cognizable claim on habeas corpus review. *McPhail v. Renico*, 412 F. Supp. 2d 647, 656 (E.D. Mich. 2006); *Robinson v. Stegall*, 157 F. Supp. 2d 802, 823 (E.D. Mich. 2001).

Hasan also claims that the trial court violated his right to due process by relying on inaccurate information. Specifically, Hasan claims that the trial court erred by determining

that a weapon was used during the offense (OV 1); concluding that kidnapping was not the basis for the jury's verdict (OV 8); using the same conduct to score more than one variable (OV 11 and OV 13); concluding that he was the leader of the incident (OV 14); and punishing him for challenging his extradition.

A sentence based on "extensively and materially false" information, which the prisoner had no opportunity to correct, violates due process. *Townsend v. Burke*, 334 U.S. 736, 741 (1948). Hasan, however, had an opportunity to challenge the scoring of the guidelines with the help of counsel before he was sentenced. Furthermore, the trial court did not rely on inaccurate information. As explained by the Michigan Court of Appeals,

- Offense Variable (OV) 1, Mich. Comp. Laws § 777.31 (aggravated use of a weapon) was correctly scored at ten points because Hasan used a car to inflict injury on Mr. Kelly and used a tree to inflict harm on CK;

- OV 8, Mich. Comp. Laws § 777.38 (victim asportation or captivity) was correctly scored at fifteen points because other aggravating circumstances supported Hasan's CSC convictions, namely, using force or coercion to accomplish penetration, aiding and abetting one or more persons, and causing personal injury;

- OV 11, Mich. Comp. Laws § 777.41 (sexual penetration) was properly scored at 50 points because there was record support for at least two penetrations beyond the six conviction offenses;

- OV 13, Mich. Comp. Laws § 777.43 (continuing pattern of criminal behavior) was properly scored at 25 points because Hasan was convicted of third-degree criminal sexual conduct in 2000;

- OV 14, Mich. Comp. Laws § 777.44 (offender's role) was properly scored at ten points because Hasan took the initiative in luring the victims to Muehlenbein's car, in causing Mr. Kelly to fall out of the car and then driving over him and kicking him, and in taking the initiative to physically and sexually assaulted CK.

The Court concludes from the state court's careful analysis of Hasan's claims that Hasan was not sentenced on the basis of materially false information.

Hasan also contends that the trial court punished him for exercising his right to challenge the extradition proceedings, but this claim is belied by the record. The trial court acknowledged that a person has a legal right to challenge extradition, and the court stated that the sentence was based on reasons other than the extradition issue. Tr. Feb. 25, 2005, at 51 and 54. The Michigan Court of Appeals correctly concluded that, contrary to what Hasan asserted, the trial court did not base its departure from the sentencing guidelines on the fact that Hasan contested his extradition.

2. *Blakely v. Washington*

Hasan alleges next that the trial court sentenced him on the basis of subjective factors, including CK's ongoing fear and psychological problems, that were unrelated to the convictions and went beyond the scope of his own conduct or what was proved to the jury. This claim is based on *Blakely v. Washington*, 542 U.S. 296 (2004), and, indirectly, on *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The Supreme Court held in *Apprendi* that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. The "statutory maximum" for purposes of *Apprendi* "is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303 (emphasis omitted).

The state sentenced Hasan as a habitual offender, that is, on the basis of prior convictions. Even if *Blakely* is relevant, the United States Court of Appeals for the Sixth

Circuit has held that "*Apprendi's* rule does not apply to judicial factfinding that increases a minimum sentence so long as the sentence does not exceed the applicable statutory maximum." *Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (explaining *Harris v. United States*, 536 U.S. 545 (2002)), *cert. denied*, 130 S. Ct. 3413 (2010). Hasan was twenty-four years old at sentencing. Although his sentence of forty to ninety years for kidnapping and the criminal sexual conduct is severe, the maximum prison sentence for these crimes is life imprisonment or any term of years. *See* Mich. Comp. Laws §§ 750.520b(2)(a), 750.349(3). Hasan's sentence did not exceed the statutory maximum sentences, and therefore did not violate his rights under the Sixth Amendment. He has no legal right to a lesser sentence. *Montes v. Trombley*, 599 F.3d 490, 497 (6th Cir. 2010).

3. <u>Cruel and Unusual Punishment</u>

Hasan's final argument is that his sentence constitutes cruel and unusual punishment because the sentence was not tailored to him, and because he was punished more severely than his co-defendants. The Michigan Court of Appeals determined that Hasan's sentence was proportionate to the offense and to the offender and, therefore, did not amount to cruel and unusual punishment or an abuse of the trial court's discretion.

This Court finds no merit in Hasan's claim because "the Eighth Amendment contains no proportionality guarantee." *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991). "Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 1001 (Kennedy, J., concurring) (quoting *Solem v. Helm*, 463 U.S. 277, 288 (1983)). "The gross disproportionality principle reserves a constitutional violation for only the extraordinary case." *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003). "[A] sentence within the statutory maximum set by statute generally does not constitute 'cruel and unusual punishment.'"

*United States v. Organek*, 65 F.3d 60, 62 (6th Cir. 1995).

Hasan's criminal history included (1) a felony conviction for third-degree criminal sexual conduct involving sexual intercourse with a minor, (2) a misdemeanor conviction for domestic violence, and (3) at least six additional arrests for violent conduct directed at his family. His sentence in this case did not exceed the statutory maximum, and the record indicates that he was the leader of a group of men who committed vicious crimes. He ran over Mr. Kelly's leg with a car, kicked him, robbed him, and then abandoned him in the street on a frigid January evening. He and his accomplices performed numerous forced sexual acts on CK, and while every instance of sexual assault is tragic, Hasan's acts were exceptionally callous. He later punched CK in the jaw and struck her head against a tree so violently that his co-defendants legitimately feared that she was dead, before finally abandoning her. The trial court judge stated at sentencing that the facts testified to at trial, and found to be true by the jury, were the most odious and offensive facts he had heard in fourteen years of presiding over cases. The court indicated that it was exceeding the guidelines because of Hasan's barbaric conduct and the serious psychological impact the crimes had on the victim. It also noted that after the incident, CK needed months of testing for HIV and hepatitis, and lived with the fear that she may have been infected. The incident transformed a normally-functioning person who was attending college while holding down a job into a recluse who will likely deal with incapacitating psychological injury for the rest of her life. Tr. Feb. 25, 2005, at 53–54.

This Court also is mindful that, in *Harmelin*, the Supreme Court found no violation of the Cruel and Unusual Punishment Clause even though Harmelin was sentenced to life imprisonment without the possibility of parole for possessing more than 650 grams of

cocaine, with no criminal history.  If Harmelin's sentence of life imprisonment without the possibility of parole for a nonviolent crime is constitutional, Hasan's sentence for violent crimes by a repeat offender is far from grossly disproportionate.   Hasan therefore has no right to relief on the basis of his sentencing claim.

### ORDER

The state appellate court's denial of Petitioner's claims did not result in an unreasonable determination of the facts or in a decision that was contrary to, or an unreasonable application of, Supreme Court precedent.

**WHEREFORE**, it is hereby **ORDERED** that the petition for writ of habeas corpus (docket no. 1) is **DENIED**.  The Court **DECLINES** to issue a certificate of appealability because reasonable jurists would not find the Court's assessment of Hasan's claims debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Hasan nevertheless may proceed in forma pauperis on appeal if he chooses to appeal this decision, because an appeal could be taken in good faith.  *See*  28 U.S.C. § 1915(3).


s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated:  October 13, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 13, 2010, by electronic and/or ordinary mail.

s/Alissa Greer
Case Manager